13.59.82 United States v. America v. Leonard Baugh Moral Argument Accusation 15 minutes per side Mr. Perry v. Defendant Appellant Good morning, your honors. My name is Ben Perry. I'm here on behalf of Defendant Leonard Baugh, who is the appellant in this matter. May it please the court, I'd like to reserve four minutes for rebuttal time. My brief in this matter essentially identified seven areas and issues that I wanted to raise. I'd like to focus today on what I consider the three primary issues. The others are somewhat derivative or ancillary. Those are going to be what I've termed in some of my papers as the adulteration of the Hobbs Act, the speedy trial issues, and then the sentencing issues, procedural and substantive. I certainly don't want to waive any issues that I raised in my brief, but that will be my focus here today. First, the Hobbs Act. It was obviously first intended to combat public corruption, extortion, and it has either evolved or devolved, depending on your perspective, into a tool that the federal government is using to prosecute what have for decades been considered garden-variety state crimes, a robbery of an individual wholly within a state. And how does the government assert that jurisdiction over these completely potentially intrastate crimes, particularly, and we'll just stick to the facts of this case, when they're alleging... You're not challenging the jury instructions, right? I'm not challenging the jury instructions, that's correct. Okay, so tell me how I'm misreading them in terms of what the real debate in trial was. So you've got this instruction that defines commerce, and it says at the end, commerce includes all other commerce over which the U.S. has jurisdiction. And then it says, you are advised that the U.S. has jurisdiction, so it's picking up on that last point, of trafficking in or possession of controlled substances, including cocaine and marijuana. So the way I looked at the instruction, and the way I think most of the argument looked at trial, was, okay, the question is whether the target here was distributing drugs. And if you showed the target was distributing drugs, it seemed to me you solved the commerce clause problem, and I thought there was quite a bit of evidence that the target was distributing drugs. So what am I missing? And my position as to that, Your Honor, would be that the Controlled Substances Act is what extends the commerce into the drug, marijuana or cocaine. The Controlled Substances Act specifically schedules substances which fall under its jurisdiction, such as cocaine, marijuana, heroin, various other things. My position as far as this appeal would be that the proof at trial did not support a finding that would fall under the jurisdiction under the Controlled Substances Act and its commerce clause. Okay, but that's what I thought the instructions were narrowing, and the instructions just required the government to show beyond a reasonable doubt that the target of the crime was distributing, say, cocaine. Great, and my position is that the proof at trial did not show that. Okay, but that's the only debate. That's the main point, as to whether there's beyond a reasonable doubt proof that the target was distributing drugs or controlled substances. A controlled substance, and I may use the word item, a controlled substance that is specifically identified underneath the Controlled Substances Act, because that's how they get their jurisdiction, and there has to be a delivery. Let me ask you about the proofs in connection with the drug in this case being cocaine. Your argument, as I understand it, is essentially that no witness testified that the cocaine that your client was involved with came from out of state. Is that basically it? That would be a portion of my position. Well, let's take that portion first. Now, there isn't any question that there is no intrastate cocaine, but let's assume that you still have to put on evidence. Unless I'm just missing something, cocaine is cocaine, and there were at least two other witnesses that did testify that cocaine came from out of state. So why is that not alone, at least enough to address this first part of your argument? That would be the second part of my argument, is there really was no proof at trial that cocaine was the target of this alleged plot. There was only one witness that was a potential co-conspirator to this plot, and he only mentioned cocaine in response to examination by the prosecution. They said, what does BRICS mean to you? And I believe his exact testimony, which was cited by the government, was, well, the first thing that would come to mind would be cocaine. So the issue here isn't whether cocaine that your client was involved with came from out of state, but rather whether he was even proven to have been involved with cocaine? I think the primary focus of my issue is whether there would be proof of cocaine. I'm not going to argue that cocaine could have been a completely intrastate. I think the law is settled. How about the prison calls? We have Bow discussing the cocaine he planned to steal from Woods. I don't believe that there's any call on the record that mentions cocaine. There are obviously mentions of drugs, vague mentions of drugs. And most of all of these prison calls, if you look closely, are post when this event supposedly occurred. I believe September 5th was the date of the alleged incident. Obviously the conspiratorial aspect of that would have been prior to that. These calls that are cited are the 6th, 7th. These are calls between individuals who are incarcerated, who have really no concept of what's going on in the real world, that are talking about drugs. I cannot point anywhere on the record to a specific call that mentions cocaine or marijuana for that instance. But they did discuss bricks. They discussed brick and any slang words for a myriad of substances. Now, generally, police officers testify sometime during these trials what these words mean to a lay jury. And is there testimony in this record that a reference to a brick means cocaine? I do not believe so. I believe that there was testimony. I believe it was Task Force Agent Carroll, who testified probably for the longest time of anyone at this trial, that in his training and experience that bricks meant drugs. I do not believe anywhere in the record he ever testified, nor anyone else testified, that it would mean cocaine or marijuana. It's the vagary of drugs. And whether or not that would trigger the Controlled Substances Act jurisdiction because of the specific scheduling and delineation of that act. There are also items tobacco is excluded from the Controlled Substances Act, I think most people do. So your theory of the case is when they say things like bricks and dope or drugs, we don't know that that's a controlled substance. That's your main point. That is a portion of it. And to trigger the federal jurisdiction under the Hobbs Act, as they've chosen to do this, that it requires a more substantial showing. So this, I think Judge McKeague was asking you this. And when you answered the question, you seemed to have answered it differently from the way I was asking you before. It did not seem that the jury instruction required the government to show whether the drugs were in commerce. It just seemed to require them to show that the target distributed drugs. That's it. And you seem to be responding to Judge McKeague by saying, yeah, the government did have to show that these drugs came from out of state, for example. I don't think the instruction requires any proof that the drugs came from out of state. It just says trafficking in or possession of controlled substances, including cocaine. It doesn't say anything about whether the cocaine came from out of state or the marijuana came from out of state. I would concede with that specific instruction, it does not require a finding that the cocaine came from out of state. Okay. So now we're down to just dope bricks means non-controlled substances. That's really your point. But they're not specified under the Controlled Substances Act. And the absence has to be more from Hobbs Act. They're a drug. They're a dope. They're bricks of something, but it just doesn't happen to be controlled substances. That's your main point. It's not a specified controlled substance that is enumerated under the Controlled Substances Act. But you lose if it's fair to say bricks equals cocaine or dope equals marijuana or cocaine. If there were actual testimony as to cocaine in the record, then I would probably lose that. Why wouldn't you lose under marijuana too? Isn't that a controlled substance? It would. It would raise a separate interstate issue that I don't think that the law would necessarily be on my side in that manner either. But you said in your brief that there was three failures here. The type of drugs were involved. That's basically cocaine. I mean, that's what you're arguing about there. Where the drugs originated, that's the question of whether cocaine comes from someplace else because marijuana can be grown locally. Or whether the alleged scheme to rob Little Said would have depleted his business. That's the interstate commerce connection. Of those three in your brief, what you're really hanging your hat on, as I understand it, this morning, is there was no testimony as to a drug covered by the Hobbs Act being involved with your client. That is the thrust of my argument. The secondary part would be if it was marijuana, I would say that there's no definitive case law in this circuit that addresses the interstate commerce. But you didn't have to under these instructions. This is the point I came to. That is correct. Either say I'm wrong, or I don't think you should make that argument anymore. Under those instructions, I would say that I am wrong. I would concede that point. Well, I'm keeping asking these questions because I'm not yet convinced that one can essentially wave away an element of an offense by virtue of an instruction, but that's a different issue. Where that leaves us is essentially, I think there's a fundamental failure to establish a substance that was controlled, that is listed, identified under the Controlled Substance Act, which is one of the two routes of how the government gets jurisdictions over these type of cases under the Hobbs Act. I also think that under the Hobbs Act, there was a failure, and it's listed in my brief, a failure to show a plan to rob this particular individual. The testimony, the only co-conspirator who testified was Adam Battle. In his testimony, he testified that he did not know what the plan was. He did not have direct contact with Mr. Ball as to the alleged plan, and he admitted that he did... Is he the one that said bricks, Adam Battle? He was the one that was asked, what does bricks mean to you? And he said, well, the first thing that would come to mind would be cocaine. That is the only mention that I'm aware of in the record of cocaine by anyone. Yeah, but he's a co-defendant. He is, but that's supposition. It's the first thing that comes to mind to him. There's no proof that that is what the conspiracy that Mr. Ball may have been involved in was targeting. Let me ask you a question about that. Judge Nixon presides over this. You make a Rule 29 motion. He then has, this is, I think, a written order rejecting your Rule 29 motion, right? Yes, Your Honor. And he tells us there wasn't any transcript of the recordings between these people. But then, but he had listened to them, of course, during the trial, and he says, quote, at trial the government presented phone records, or excuse me, quote, at trial the government presented phone conversations in which Mr. Ball detailed the firearms and amount of cocaine he believed would be found at Mr. Wood's residence. And then he cites us to an exhibit with a page ID number in the record. Are you contending that that's just, he's just dead wrong there? Yes, Your Honor. I believe that that section is taken almost verbatim from the government's response to my motion and that I don't believe that the record of any call itself would actually have mentioned cocaine. I believe that's been an assertion by the government all along, and it's been wedged into their briefs as far as what the drugs were. But I believe that an actual look at the record or review of the calls is not going to support that finding. Thank you. We'll hear from your adversary. Good morning. I'm Sonny Koshy. I'm the prosecutor that was responsible for the investigation and prosecution of this case. I can never remember how your last name is pronounced, so I appreciate it. I'm Sonny Koshy. Judge Echols once called me Mr. Sushi, which is still told in the courtroom. It's hard for me to know what to call you because I can barely hear you. Would you speak up, please? I will try, sir. Keeping along the same theory I was just asking about, Judge Nixon recited two items of evidence. One is these phone calls, and your brother counsel says they don't say that at all. And then also he refers to the testimony of Adam Battle that described the plan to rob Woods because they believed he had a large amount of cocaine at his residence. Now, do those two things that Nixon is citing, that apparently he took from your pleadings, say that? The calls themselves that he's referring to, where I think I know where you're talking about, he says the calls refer to cocaine. The calls do not use the word cocaine as such. That's his interpretation based on the evidence of what the calls mean. What's the language that was used to draw that inference? It may be helpful for the court if I go through a list of calls. I know Exhibit 10 is the one that Judge Nixon decided to cite in his order. So what happens is on September 2nd, it's Exhibit 5, Jamal Shakir talks to Christopher Conyers. And Conyers says he talked to Hype, who's Leonard Ball, as identified in the record. I talked to him today. He called me. Conyers said he got both letters. And Shakir then tells him to go ahead and do, quote, number one. Needs to be as soon as possible. Number one is quoted in the briefs. That's that number one, the mission list. And the wording of that, I think, is very important. It's something that the jury could interpret and has a sufficient basis for the conviction here. Okay. What's number one say? It says, it's got Little Said's name, his address. He says he thinks this spot, quote, is, quote, low key. It needs to be a lay and wait late night situation. Grab the digger and make him take them inside the house. Get money and dope off him. And then in parentheticals in the mission list, on his person and dope and money out of the house. They have to be very effective because the little nigga stays trapped with the 40 clock. Okay. So we got dope. Did somebody say what dope meant during the trial? Yes, Your Honor. Adam Battle at page ID 8455, for instance, is asked by me, what were you supposed to be searching for? Answer, drugs. Question, anything else that was supposed to have been in there that could have been gone that you remember? Answer, nothing, but I took a TV. Question, I mean, before you even went in the house, what all were you thinking would be in the house? Answer, just drugs. Question, what kind of drugs? Answer, bricks. Bricks. Question, by the term bricks, what do you mean? Answer, well, cocaine. What first comes to mind is cocaine, yes. Okay. You've already referred us so far to dope. Is there some other place where witnesses referred to bricks? Yes, Your Honor. As we go through. So we don't need to spend a lot of time on it. I mean, you got reference to dope. You think the jury could conclude that included cocaine. And then you got bricks, which means cocaine. Is that basically it? Yes, Your Honor. And the citation to where the word bricks is used is by Ball himself in Exhibit 10 that Judge Nixon cites to you. And here he's talking about his conversations with Shakir. He says, Cuz said there would be two to three bricks. I wanted to catch the nigger, catch him slipping, which goes to his point that it was never supposed to be a robbery. It was supposed to be a burglary. Well, Hype himself, excuse me, Mr. Ball himself says, I wanted to grab the nigger, snatch the nigger, catch him slipping. And then later on. Yes. So I guess my main point here is that obviously we can't ask Hype, well, what did you mean by bricks? But the person he sent, one of the five he sent to carry out this mission, is his brother and co-defendant and co-conspirator Adam Battle. And Adam Battle uses that same term. That's a lot more helpful than a police officer testifying in general in the community, well, bricks means cocaine. Battle rolled over on his brother, I take it? Yes, Your Honor. And he testified that based on his brother's instructions, he went there believing there would be cocaine? Yes, Your Honor. He used the word cocaine?  I quoted it at page ID 8455. Okay. All right, thank you. The other point that Mr. Perry made on behalf of his client here is this whole idea that, well, the house was unoccupied when they broke in. To shorten all this, don't you think the key point is if you're connecting all this to controlled substances, the only thing I've heard so far is cocaine, and it really is that answer, what do bricks mean? And he says cocaine, period. The first thing that comes to mind is cocaine. That's the whole, isn't that really the whole thing? That's either enough or it's not. I mean, because everything else is dope and drugs and there could be non-controlled substances that are dope and drugs. So it seems to me, I'm not saying you lose, I'm just saying it seems like that's the essence of the point. I guess my point really, Judge, is that let's say we didn't have the brother flipping on the older brother. Okay. We think that the rest of the testimony here, the conversations, the note, how they went about it, is enough to show, to sustain a jury verdict, that it was a drug-related robbery. Drugs, per se, are within the commerce clause. So I would like to have... Doesn't the instruction require controlled substances? And that means, that refers to a federal law. That doesn't allow you to sneak in a non-controlled substance that moves interstate commerce, I don't think. Because that's the way the instruction reads. That's absolutely true. So it really does just come down to cocaine, I think. My point is, the jury could by themselves, with the other language, let's say, leave out Adam Battle's testimony that it was cocaine, that he believed it was cocaine. The other language is so clear that the jury could determine that it was a controlled substance. They weren't in there seeking value, some other kind of. So that's my broader point. Because we use this statute in lots of instances to dismantle large violent gangs. We don't want to have to always have to find the cooperator. We do. We try to. We try to flip Little Said, who invoked on the stand. But this tool is so important, that's why the government seeks a broader ruling that the commerce clause, that this instruction, you know, there's been some discussion about, well, the instruction is sufficient. Narrows the debate, it seems to me, don't you think? It does. Very much so. I think your big objectives would be quite a bit of dicta, don't you think? Probably. And I enjoy dicta, so it may work, but I don't know how helpful it will be in the next case. Down at our level, we can use whatever we can get. I'm just telling you how it is. Generally, we enjoy dicta if we wrote it, not so much. If somebody else wrote it and we're trying to deal with it later. Well, as Judge Gibbons did in, I think, distinguishing the, oh, gosh, it's that Peterson case out of the Seventh Circuit, you were the author on the Upshaw case that we cited. And you mentioned that a key part of that was probably dicta. I still remember. Really, dicta is a really useful word in later, in subsequent cases. Back to the facts of this case. The instruction that's talking about the jurisdiction of the United States refers to controlled substances as including cocaine, crack cocaine, and marijuana under the Commerce Clause of the Constitution of the United States. One would normally expect when that instruction is being proposed by the government, assuming you're the one that wrote that, that were there no facts in the record that could support a verdict for those drugs, perhaps there would have been an objection to the inclusion of those references in the jury instructions. Now, I don't know whether the lack of one is or is not dispositive, but was there any objection in connection with the settlement of the instructions as to whether there was sufficient evidence in the record to justify that instruction? There was not, Your Honor. I actually pulled the transcript from the jury charge conference. It's been two years. I might not remember. But that, for the record, is page ID 10-518 through 10-526. The only objection to- Whose instruction was this? Yours or his? Mine. We both submitted jury instructions. The government submitted first the proposed jury instructions. They followed. Then we had a charge conference, and it boiled down to the objection that those page numbers- the only objection was really the co-defendant makes an argument which Mr. Perry simply adopts. The only objection is that there's been a change in theory. That's it. Thank you. Unless the court has any more questions about the Hobbs Act, I'd like to move on to the speedy trial issue in this case. There's also a sentencing issue which I think has been fairly well briefed. I'd like to spend a little time on the record about the speedy trial matter because that obviously was a lengthy case, was a lengthy investigation, a lot of docket entries. On going back and reviewing the government's brief, which I did not write, Mr. McDonough wrote that, I realized something that may not be clear to the court yet. The defense says the first realistic trial date was January 25, 2011, because of when the defendant was actually brought into custody and arraigned and all that. And that's sort of where he starts the speedy trial analysis. Now, one of the problems with that is on that date, the defendant did not even have counsel. And the way that happens is that he was first represented by Mr. Jim Simmons, who had to withdraw because of potential conflict. He's appointed Mr. David Commissar. That appointment was on December 27, 2010. And on January 6, 2011, just two weeks later, Mr. Commissar files a motion to withdraw, citing attorney-client differences. At that same time, Mr. Ball, who now insists he wanted a trial as quick as he could all along, writes a letter, and this is at page ID 878. He says, I need all my paperwork like I asked Mr. Nixon, and until I have all that and able to get prepared for my case and file all the motions I need filed, I am not prepared to even enter a courtroom to discuss anything. That is the same tact he takes all along until later on when he decides to file his speedy trial motions. The motion to withdraw filed by Mr. Commissar is granted January 12, 2011. So on the January 25 date, he has no counsel. Mr. Perry enters his notice of appearance on February 2, a week after the trial date. This goes on, and there's already a discussion about Mr. Perry has signed off on a motion which agrees that the case is extended and complex. Then, when he enters his appearance, trial was set for April 5, 2011. Clearly could not have reviewed all the discovery by then. And on March 3, 2011, at docket 442, there's a motion filed by Jermaine Smith's lawyer stating that he's consulted with other counsel, including Ball's counsel, and there's an agreement to set the trial on November 1, 2011. It's actually set for November 8, 2011. But three weeks before that, Mr. Perry files a motion to withdraw, three weeks before that trial date. Citing differences, there's a letter from Mr. Ball that, again, says he wants to file more motions, and that's on October 27. So throughout that time, they're not ready for trial. I'm running out of time, but I want to point out that the one time that the defendant actually moved to, excuse me, objected to a continuance of a trial, is found at docket 1294. In that case, it was a motion to continue, or multiple motions, I forget which. The court grants it without any objection. None of these continuance were objected to by any defendant before the court acted. Three weeks after that order of continuing is entered is when Mr. Ball files an objection to the continuance that's already occurred. That's the type of thing you'll see with a detailed review of the docket. So we believe that Judge Nixon's order denying the motion for a speedy trial on constitutional and statutory grounds were correct. All right, Mr. Perry. The Exhibit 10 that was referenced by the government and that's been referenced in the briefs and whatnot, and this court has already recognized that in the Conyers opinion that you authored earlier this week on the briefs and under the Rule 11 context, that was communication between Mr. Conyers and Mr. Shakir. The entire contents of that communication have never been completely attributed to Mr. Ball himself. I just want to make that distinction there. That was a communication between them. That doesn't make a difference, does it? No, I just wanted to draw that distinction. I think for my main argument, that would probably not rule the day, so to speak. One issue that did come up is Mr. Koshy had represented that Adam Battle, who is Mr. Ball's brother, had received this information from Mr. Ball. I believe that the trial testimony immediately before the section he cited would inform the court that he repeatedly testified that he received information from other individuals and not Mr. Ball, such as Mr. Howard Coleman, Paul McQuitty, and others, just to draw the streaks in that that is not accurate. Why do we care about all this if it's a conspiracy count? I would submit that there is not an opportunity for someone to come in and say, hey, I was a drug dealer, these were drugs, these were supposed drugs. All the conspiracy cases that deal with non-affectuated, no-substantive crimes deal with specific information, usually controlled by the government. A CI, an undercover agent or whatever, has provided information that says there is a cocaine, I'm a member of a cocaine distribution, we've got a shipment coming in from wherever, Mexico. They cover all the jurisdictional bases in those facts, and those are absent here. But the point is, actions of one conspirator are attributed to the others if it's reasonably foreseeable, and these discussions with this mission list and all that involve members of the same conspiracy, don't they? Correct, and still even those discussions don't, save the speculative statement by Mr. Battle, none of those still mention cocaine, marijuana, heroin, any other drug. He read a testimony that said bricks mean cocaine. And followed by, the first thing that comes to mind is cocaine. And my position is, in the scope of beyond a reasonable doubt, that should not be enough for any reasonable juror to find that it was cocaine that would fall under the Controlled Substances Act and give federal jurisdiction to that count. So why didn't you object to the instruction if there wasn't sufficient evidence to convict for cocaine? Well, I think that the instruction was an accurate statement of the law that they had presented, and there were other counts. There were other Hobbs Act counts. Count 16, we had a count where they proved up cocaine. They called it, it was a conspiracy count, they called it. We haven't raised that on appeal because they satisfy their burdens under that same jury instruction. So the jury instruction was completely applicable to Count 16, I believe it was, the 12th Avenue Little Wee Wee incident. So that was why there was no objection. So wait a minute. He was convicted under another cocaine count. You're not appealing from that? You're just saying the evidence attributable to this particular robbery doesn't corroborate that it was cocaine? Right. The target of the other count came into court, testified that he was a cocaine dealer at that time, that his cocaine came from out of state, that had he actually been robbed, he would have been. Was that dealer connected to the dealer involved in this count in any way? Not that I'm aware of. That was never raised. Not that you know of. No. There was never any proof or discussions of them being tied in any way. As to the speedy trial issue, briefly, I realize I'm running out of time. I think it's argued in my brief about as well as I can, the actions by the government in continually stringing together these indictments and re-indicting and adding what I would posit are unrelated counts. Mr. Ball, we've moved for severance at practically my earliest option. We moved for that in May of 2011. The court didn't even set a hearing on my motion to sever then until 2013. There was roughly a 19-month delay before they even set a hearing. How is a defendant supposed to extricate himself from this type of conduct and this sort of inaction by the courts? My position would be that it can't be excused, the delay can't be excused when the bulk of the blame lies at the feet of the government or the inaction of the court in this case. In that period, did you go back and ask the judge to rule on your motions that had been pending for some time? Yes, Your Honor. May 10th, I filed a motion to sever. That was May 10th, 2011. March 29th, 2012, I renewed that motion. It was never ruled on. I filed a speedy trial motion June 7th, 2012. Prior to a trial set for August in 2012, I filed on July 9th, 2012, a motion to designate what counts are we actually going to try to no response. I objected to the continuance of that trial in September of 2012. I filed a second speedy trial motion in October of 2012. I filed a third speedy trial motion in November of 2012. Those were finally set November 30th for a hearing on December 17th. December 21st, the court finally set my original severance motion from 19 months earlier for a hearing in January of 2013. I just think it's disingenuous, and the court relies heavily on the number of motions, but if you look closely at the motions that were filed by more than one defendant, we had to keep filing these motions because nothing was happening. We didn't have any way to remedy the situation and assert our rights to a speedy trial constitutionally or statutorily. Thank you, Your Honor. We thank you both for your argument, Mr. Perry. We note that you were appointed under the Criminal Justice Act to represent Mr. Ball, and we are very appreciative of your undertaking that representation and your zealous representation of him. Thank you all. And you may adjourn court.